**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **LISA M. NOYES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Cause No. 1:05-cv-278** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

### I. INTRODUCTION

Plaintiff Lisa M. Noyes seeks judicial review[1] of the final decision of the Defendant

Commissioner of Social Security, Jo Anne Barnhart, who found that Noyes was not entitled to

Supplemental Security Income ("SSI") or Social Security Disability Insurance Benefits ("DIB").

In short, because the Court finds that the Administrative Law Judge ("ALJ") improperly

evaluated the medical opinions of record, wrongly discredited Noyes's testimony, failed to

consider the testimony of Noyes's former supervisor, and potentially erred when posing

hypothetical questions to the Vocational Expert, the Commissioner's final decision will be

REVERSED and REMANDED for rehearing.

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Introduction and Procedural Background

Noyes filed concurrent claims for SSI and DIB on March 19, 2003, alleging a disability

onset date of January 1, 1988. (Tr. 59-61, 240-41.) ALJ John S. Pope conducted a hearing on

January 13, 2005, and rendered an unfavorable opinion on February 24, 2005. (Tr. 12-20.) The

Appeals Council denied Noyes's request for review. (Tr. 5-7.) Noyes filed here on December 5,

2002, seeking review of the Commissioner's decision, and the matter is now fully briefed.

At the time of the hearing before the ALJ, Noyes was twenty-nine years old and had an

eleventh grade education. (Tr. 254, 256.) Since 1993, Noyes has worked for an extensive list of

employers for short periods of time, including employment as a fast food worker, a machine

operator, a janitor, and a retail worker. (Tr. 62-66, 259-65, 318.) She claims she can no longer

work due to depressive disorder, not otherwise specified ("NOS"); panic disorder with

agoraphobia; and borderline personality disorder.[3]

### B. Medical Evidence

Although Noyes alleges disability since 1988, her medical records date from March 27,

2003, eight days after she filed for DIB and SSI, when Heidi Hockemeyer, a social worker at

Neuropsychiatric Associates, performed an intake assessment.[4] (Tr. 149-53.) Noyes complained

---

[2] The administrative record in this case is voluminous (321 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3] Because Noyes apparently does not dispute the ALJ's findings regarding her physical conditions, specifically her arthritis, the Court will focus its inquiry on those findings pertaining to her mental health.

[4] The transcript provides little insight into what medical conditions or treatment Noyes had before 2003. During this appointment, however, Noyes reported that when she was twelve, she saw a child psychologist, who prescribed anti-depressants that she took for one year. (Tr. 149.) She also claimed to have had "talk therapy" with a pastor for one year. (Tr. 149.)

of disrupted sleep, loss of appetite, and a racing heart when she was angry or anxious. (Tr. 149.)

She also described impulses to hurt herself, which resulted in cutting her arm and attempting

suicide. (Tr. 150.)  Reporting that she consumed alcohol two days before the exam and smoked

marijuana three days prior, Noyes also admitted to using acid, cocaine, uppers, mushrooms, and

heroine in the past. (Tr. 152.) Noyes reported having a good relationship with her mother and

one of her sisters, named three people as her friends, and listed her recreational activities as pool,

poetry, outside gardening, and partying. (Tr. 151.)

   Hockemeyer diagnosed mood disorder, alcohol abuse, and marijuana abuse and made

rule out diagnoses of alcohol dependence, bipolar disorder, and personality disorder, rating

Noyes's Global Assessment of Functioning ("GAF") at 55.[5] (Tr. 153.) Although Hockemeyer

recommended continued assessment, evaluation for medication, and one-on-one psychotherapy,

Noyes did not heed these recommendations, and she was discharged from Neuropsychiatric

Associates because she did not keep any of her follow-up appointments. (Tr. 146-48, 153.)

   On June 13, 2003, Doctor Candace L. Martin performed a psychological evaluation at the

request of the Social Security Administration. (Tr. 155-61.) Noyes informed Dr. Martin that she

filed for disability because "[she] can't cope with anything," but also explained that she quits

jobs because she gets bored and is not a "morning person." (Tr. 155.) Noyes reported feeling like

people are judging her, thinking that people are weird and scary, preferring to be left alone, and

not liking what people say to her. (Tr. 155.) Although Noyes told Dr. Martin that from ages

fifteen to seventeen she used marijuana and alcohol "to be with her peers," she does not use

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American
Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000)
(hereinafter *DSM-IV-2000*). A GAF score of 55 reflects "moderate symptoms" or "moderate difficulty in social,
occupational, or school functioning." *Id.* at 34.

these substances anymore. (Tr. 155.)  She also reported going out with friends once or twice a month. (Tr. 156.)

Regarding prior mental health evaluations, Noyes reported having a psychological examination at Park Center in 1998 at the request of Child Protective Services ("CPS")[6] and that she went to counseling four times during February and March of 2003 at the office of "her psychiatrist," Dr. Bisht.[7] (Tr. 155.)

Dr. Martin noted that Noyes made no mention in the interview of having the panic attacks that were described in other documents of record. (Tr. 158.) Furthermore, although Noyes reported taking special education classes in school, Dr. Martin noted that her current intellectual functioning measured by an IQ test was in the average range. (Tr. 155, 158.) In addition, Dr. Martin concluded that Noyes's complaints of  "worsening memory skills" were not supported because her short-term memory and working memory as measured by the IQ test fell "well within the average range" and because results from her mental status exam revealed that her "long-term, intermediate, and short-term memory skills all appear to be quite within normal limits." (Tr. 155, 158.)

Dr. Martin also concluded that "[i]n general, [Noyes's] mental status functioning appeared to be quite normal," although the mental status exam suggested that Noyes "tends to be inattentive toward her environment and daily events in the world" and that she shows "some mild difficulty with judgment and insight suggesting possible tendencies towards poor

_____

[6] Noyes has two sons, who were ages seven and nine at the time of this exam. (Tr. 155.)

[7] Dr. Bisht is a doctor at  Neuropsychiatric Associates, who coincidentally signed Noyes's letter of discharge. (Tr. 146.) The transcript does not indicate that Noyes ever had an appointment with Dr. Bisht, and apparently Noyes now concedes that the March 27 appointment was the only time she sought treatment at Neuropsychiatric Associates.

impulsivity control." (Tr. 158.)  Noting that Noyes assumes "considerable responsibility for chores of preference," Dr. Martin opined that her ability to function independently was "limited only in respect to her preferred irresponsibility for financial management." (Tr. 158.) Diagnosing Noyes with adjustment disorder with mixed anxiety and depressed mood, and possible dysthymic disorder, Dr. Martin assigned a GAF of 57.[8] (Tr. 159.) Dr. Martin concluded that Noyes was capable of gainful employment because she was able to "communicate effectively, interact one-on-one quite appropriately, and focus her attention and sustain concentration on various tasks." (Tr. 158.)

At the request of the State Agency, W. Shipley, Ph.D., and F. Kladder, Ph.D., reviewed the record. (Tr. 162.) Both diagnosed Noyes with affective disorder but concluded it was not a severe impairment. (Tr. 162, 174.) When asked about her functional limitations, they opined that Noyes had "mild" restriction of activities of daily living; "mild" difficulty in maintaining social functioning; "mild" difficulty in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 172.) Larry Kravitz, Psy. D., also reviewed the record for the State Agency, concurring with the opinions of the other State Agency medical consultants. (Tr. 176-78.)

On October 3, 2003, Noyes sought treatment at Park Center, where she was assessed by Heidi Hedrick, Ph.D. (Tr. 224.) Among her complaints, Noyes reported that she is angry all the time, does not trust anyone, compulsively cleans, has problems sleeping, has problems with her body image, and her mind never stops. (Tr. 224.) She also described feeling lonely, anxious,

---

[8] A GAF score of 57 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *DSM-IV-2000* at 34.

5

nervous, worried, and that everything is a big deal. (Tr. 224.)  Indicating that her boyfriend of three and a half years recently moved out of her house, Noyes believed this might be the cause of her stress. (Tr. 225.) Noyes reported no difficulty in taking care of her personal care needs and that her mother is her support system. (Tr. 225.)

Informing Dr. Hedrick that she had previously been evaluated at Park Center for a CPS case, which resulted in having her children taken away, Noyes reported that she had significant problems with CPS due to her marijuana usage. (Tr. 224-25.)  While Noyes admitted she still occasionally smokes pot and that she was charged with OWI in December 2002, she denied any drug or alcohol use in the last thirty days. (Tr. 225.)

On mental status exam, Dr. Hedrick found Noyes's appearance and behavior appropriate; her mood/affect, speech, and thinking form normal; her insight minimal; and her thought content blaming. (Tr. 225-26.) She diagnosed depressive disorder, NOS and borderline personality disorder, rating Noyes's GAF at 65.[9] (Tr. 226.)  Dr. Hedrick recommend individual therapy and a psychiatric evaluation. (Tr. 217, 227.)

On November 24, 2003,  Jennifer Fray, Psy. D., of the Park Center performed a psychological evaluation at the request of the Allen County Office of Family and Children to determine Noyes's eligibility to receive DIB. (Tr. 218.) Noyes's complaints were similar to those she reported to Dr. Hedrick, primarily complaining of depression, which she claimed she suffered from since age twelve but had gotten worse over the past year. (Tr. 218-19.) Reporting decreased energy and motivation, Noyes stated that she does not do much and does not have any

---

[9] A GAF score of 65 reflects "some mild symptoms . . . [or] some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." *DSM-IV-2000* at 34.

specific interests. She reported that she reads books occasionally and likes writing, playing

games, and shooting pool, but she has gotten so aggravated that she does not care to do these

activities anymore. (Tr. 218.) Claiming that she has suffered from anxiety since the age of

thirteen or fourteen, Noyes reported that she does not leave her home and that her anxiety centers

around fears of men looking at her and what people think about her. (Tr. 219.) She also reported

problems with anger and irritability, which also results in her avoiding people and not leaving

her house. (Tr. 219.)

Noyes reported that she drank one pint of vodka on October 30, stating that sometimes

she can control her intake of alcohol and sometimes not. (Tr. 220.) She admitted to some use of

marijuana, most recently one week prior to the evaluation, but did not believe she had any

problems with drugs and alcohol. (Tr. 220.)

On mental status examination, Dr. Fray noted that Noyes arrived approximately five

minutes late, with Noyes explaining she is always late because she is nervous about talking with

people, and there was a part of her that did not want to come to the examination. (Tr. 220.)

Documenting Noyes's anxious mood and affect, Dr. Fray found that her motor activity was a

little overactive, as she moved around "quite a bit" in her seat during the early part of the

assessment but slowed down and relaxed after a few minutes. (Tr. 220-21.) Dr. Fray also noted

that Noyes appeared to have difficulty concentrating on the task at hand due to negative feelings

about herself, stating "I feel very stupid" throughout the assessment. (Tr. 221.) Dr. Fray

concluded that Noyes's reasoning was within the average to low-average range and that her

judgment was likely influenced by indecisiveness and possibly impulsiveness. (Tr. 222.)

Diagnosing dysthymic disorder, social phobia, and rule out borderline personality

disorder, Dr. Fray rated Noyes's GAF at 50.[10] Dr. Fray recommended that she continue

individual therapy, possibly try group therapy, undergo a psychiatric evaluation to evaluate the

usefulness of medications, and undergo further psychological testing to determine whether she

has a personality disorder. (Tr. 223.) Dr. Fray's prognosis was guarded due to Noyes's

inconsistency in attending appointments. (Tr. 223.)

On January 7, 2004, Christine Raches, a psychology intern at Park Center, developed a

treatment plan with Noyes, which included weekly sessions with Raches, but Noyes refused a

medication appointment; Dr. Fray signed the plan to certify its medical necessity. (Tr. 214-16.)

During this appointment, Raches noted diagnoses of major depressive disorder, recurrent; mild

and generalized anxiety disorder; and opined a GAF of 51.[11] (Tr. 214.) On March 3, 2004,

Raches conducted a ninety day review of this treatment plan and developed a continuing care

plan, noting that Noyes was beginning to use self-talk as well as re-framing to decrease her

depression and that she had become more honest and open in her sessions. (Tr. 211.) Raches

opined, however, that Noyes needed to be more active and follow through with items discussed

in therapy, to increase her activity level, and to attend a medical evaluation. (Tr. 211.) Dr. Fray

signed this report, noting that Noyes's symptoms and severity might justify more intensive

services. (Tr. 213.)


On March 29, 2004, Dr. Mohammad Sami of the Park Center completed a psychiatric

---

[10] A GAF of 50 reflects "serious symptoms" or "any serious impairments in social, occupational, or school functioning." *DSM-IV-2000* at 34.

[11] A GAF score of 51 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *DSM-IV-2000* at 34.

evaluation of Noyes, diagnosing depression, panic disorder with agoraphobia, and social anxiety, rating Noyes's GAF at 55. (Tr. 210, 229.)

In May 2004, Noyes's treatment plan was reviewed by Raches, who noted that Noyes was more honest in therapy, was completing her homework, was developing openness to opinions, was beginning to explore her rigid thinking, and was referred to Dialectical Behavioral Treatment ("DBT") for more intensive services.[12] (Tr. 207.) Dr. Fray signed this review, noting that the transfer to DBT appeared appropriate given Noyes's clinical needs and Raches's internship ending soon. (Tr. 209.)

In July 2004, her plan was reviewed again, with Raches noting that Noyes was more open during therapy, was more willing to explore rigid thinking, was using relaxation skills as well as mindfulness skills to target irrational thoughts, and was taking medications more regularly. (Tr. 203.) Although she was initially resistant, Noyes made an appointment for DBT. (Tr. 203.) Dr. Fray signed the review, noting Noyes's progress. (Tr. 205.)

Raches completed a Hoosier Assurance Plan Instrument ("HAPI") on July 29, 2004, rating Noyes's anxiety/worrying and her depression as severe. (Tr. 195.) Raches found, however, that Noyes had only minimal difficulties or problems in the following functional categories: occupational functioning, daily functioning and independent living skills, time and task orientation and learning ability, family support and interpersonal relations, and risk behavior. (Tr. 196-97, 200.) Raches opined that Noyes requires total reliance on mental health services, does not take responsibility, and requires supervision, noting that without therapy and

---

[12] DBT is a "cognitive-behavioral therapy for people with borderline personality disorder or other impulse control problems such as suicidal and self-injurious behavior and risky substance use." Park Center, Inc., *Child & Adult Services* (March 7, 2006), http://www.parkcenter.org/Child%20and%20Adult%20Services.htm.

medications, Noyes would experience "severe difficulty in occupational and interpersonal functioning such that poverty, possible suicide, and harm to others is possible and appeared imminent." (Tr. 201.)

Noyes did not show up for her August 2, 2004, appointment with Dr. Sami, but she did make her September 30, 2004, appointment. (Tr. 229.) Dr. Sami noted that Noyes presented with a history of depression and described paranoia, anxiety, mind racing, nervousness, mood swings, agitation, anger, frustration, panic attacks, and paranoid thoughts around people. (Tr. 229.) She reported that at times, she thinks about dying and also believes she is feeling crazy, that she is not feeling better, and that she is unable to function. (Tr. 229.)

Noyes went to the emergency room on October 12, 2004, complaining of symptoms that were "kind of like an anxiety attack." (Tr. 184.) She reported a history of anxiety attacks caused by anger or being worked up over something, but said this attack occurred when she was just resting and under no stress. (Tr. 184.) After physical examination and testing were normal, Dr. Sara Brown discharged Noyes, concluding that her symptoms were related to her anxiety and the new antidepressant medication she was taking, recommending that she follow up with her primary care physician. (Tr. 184-85.)

On October 27, 2004, Dr. Sami performed another psychiatric evaluation and completed a Mental Impairment Questionnaire and Medical Source Statement, but the record indicates that Noyes did not show up for any of her scheduled appointments after this date. (Tr. 210.)

On the Mental Impairment Questionnaire and Medical Source Statement, Dr. Sami diagnosed depressive disorder, NOS; panic disorder with agoraphobia; and borderline

personality traits, rating her current GAF at 48 and her highest GAF during the past year at 60.[13]

(Tr. 179.) He listed clinical findings and results of mental status examinations as severe anxiety,

panic attacks with shortness of breath, fear of dying, isolation, depression, paranoid thoughts,

and people talking about her. (Tr. 180.) Opining that Noyes would miss about four days of work

per month due to her impairments or treatment, Dr. Sami rated her ability to perform seventeen

work-related mental activities as "poor" and rated the remaining five activities as "fair." (Tr.

181-83.) He opined that her severe anxiety, frequent panic attacks, fear of anxiety attacks, poor

concentration, and forgetfulness supported this assessment. (Tr. 183.)

### C. Administrative Hearing

At the administrative hearing, Noyes testified that she could not work because she would

rather be at home and because she felt judged and "picked on" by her bosses, co-workers, and

the public, although she admitted that most of the criticism she received from her bosses was fair

since she was not completing her tasks and was rude to customers. (Tr. 268, 289-93.) She also

stated that her main problem with working was absenteeism because she "didn't want to get out

of bed." (Tr. 289, 293.)

Noyes complained of daily depression and anxiety that keeps her in bed and makes her

"completely paralyzed"; her symptoms include difficulty concentrating and remembering, chest

pain, sleep problems, and diarrhea. (Tr. 273, 279.) She testified that she is supposed to see her

doctor about once a month, but she does not always keep her appointments if they are early and

if she is scared that something bad will happen. (Tr. 280-81, 295-96.) Noyes also testified that

---

[13] A GAF of 48 reflects "serious symptoms" or "any serious impairment in social, occupational, or school functioning," while a GAF of 60 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *DSM-IV-2000* at 34.

after the counselor she was seeing was transferred, she stopped attended therapy sessions, despite a new counselor contacting her to set up an appointment. (Tr. 281-82.) Furthermore, she has not followed through with Dr. Sami's recommendation that she get a physical for her chest pain and diarrhea. (Tr. 286, 297.)

Noyes testified that she is able to perform most household chores and care for her children on days when she has visitation, but that she does not go grocery shopping and cannot manage her financial affairs. (Tr. 273-78.) She believes she could care for her children full-time. (Tr. 298.) She reported that she does not have any friends, never spends times with friends, does not like to be around people, and has not used drugs or alcohol for the past two years. (Tr. 282-83, 298.)

Lisa Sheeley, Noyes's sister, also testified, indicating that she thought Noyes "sugarcoated" her conditions and that her problems are "extremely worse then [sic] what she described." (Tr. 301.) She stated that Noyes does not get out of bed or answer her phone and that it was impossible to have a relationship with her. (Tr. 301.) Sheeley specifically mentioned that Noyes had to be dragged out to eat with the family at Christmas and then hurried up "so she [could] go back home and crawl into bed." (Tr. 302.) Noyes was also supposed to host a dinner the week before Christmas, but when Sheeley arrived, Noyes was still in her pajamas and had done nothing. (Tr. 303-04.) Sheeley also testified that an anxious Noyes calls her during the night "once every couple weeks" and that Sheeley stays on the phone reassuring her for at least four hours. (Tr. 304-05.)

Timothy Brown, Noyes's former live-in boyfriend and supervisor, testified to observing "a lot of forgetfulness" and absenteeism while Noyes was working as a seasonal employee and

12

that he had to help her at the end of her shift because her work was not completed. (Tr. 307, 310.) He also explained that although he gave Noyes "normal" criticism while on the job, he felt he needed to be "extra nice" to her so she would not overreact. (Tr. 309.) Despite these problems, Brown stated that had there been an open position, she could have successfully continued to work there if she showed up on a regular basis. (Tr. 310.)

Brown further testified that after Noyes's employment ended, they began dating and eventually moved in together, and he continued to observe her forgetfulness and emotional outbursts. (Tr. 312.) Stating that they did not go out much, Brown explained that if there was "a bunch of people, you might as well forget it." (Tr. 314.)

Joseph Thompson, a vocational expert ("VE"), also testified. (Tr. 315-20.) When the ALJ asked the VE what jobs a hypothetical individual of Noyes's age, education, and work history, who was limited to light work involving only simple, repetitive tasks, could perform, the VE answered that the individual could perform Noyes's past relevant work in fast food, janitorial, and retail. (Tr. 318-19.) He also testified that the individual could perform such jobs as food preparer, laundry folder, and machine tender, but if the ALJ found Noyes's testimony about her limitations credible, there were no jobs she could do. (Tr. 318-19.)

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act ("Act") grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

13

supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. DISCUSSION

### A. Legal Framework

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Noyes is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a

14

severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[14] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### B. The ALJ's Decision

In a written decision issued on February 24, 2005, the ALJ determined that Noyes was not disabled. (Tr. 12-20.) The ALJ decided in Noyes's favor on steps one and two, finding that Noyes's arthritis, depression, and anxiety were severe, but also finding that she did not meet a listing at step three. (Tr. 19.) He then ascertained that Noyes had an RFC "to perform light work that does not involve more than simple, repetitive tasks." (Tr. 19.) Based on this RFC, the ALJ found at step four that Noyes could perform her past relevant work as a fast food worker, factory worker, and retail worker. (Tr. 19.) Relying on the testimony of the VE, the ALJ alternatively found at step five that Noyes was capable of performing work in the national economy. (Tr. 19-20.) Therefore, Noyes was not entitled to SSI or DIB. (Tr. 19-20.) In reaching this decision, the

---

[14] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

ALJ "rejected" Dr. Sami's opinion and found that Noyes's allegations regarding her limitations were not totally credible. (Tr. 17, 19.)

Noyes argues that the ALJ erred when evaluating the medical evidence because he did not give a proper explanation for rejecting Dr. Sami's opinion and because he failed to evaluate the opinions of Dr. Fray and Raches. Furthermore, Noyes asserts that the ALJ improperly discredited Noyes's own testimony and failed to give reasons for rejecting the testimony of Sheeley and Brown. Finally, she argues that the hypothetical the ALJ advanced to the VE failed to accurately reflect all of her limitations. These arguments will be discussed in turn.

### C. The ALJ Improperly Evaluated the Medical Opinions of Record

The opinion of a treating physician should be given great weight in disability determinations because of his or her greater familiarity with the claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). More specifically, if the ALJ finds that the treating physician's opinion is "well supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record," the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

In the event the treating physician's opinion is not given controlling weight, the Commissioner applies the following factors to determine the weight given to the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§

404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).[15]

Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). While an ALJ is not required to provide a written evaluation of every piece of evidence, he does have a duty to "sufficiently articulate his assessment of the evidence to 'assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of the [his] reasoning.'" *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (quoting *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985))); *see also Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (citing *Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir.1994)) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (opining that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether it was even considered).

Here, the ALJ simply "rejected" Dr. Sami's opinion that Noyes would likely miss more than four days of work per month and that she had no useful ability to perform many work-related activities, finding Dr. Sami's limitations "not consistent with the objective medical evidence nor are they corroborated by any other medical opinion of record." (Tr. 17.) In rejecting Dr. Sami's opinion, the ALJ failed to meet his duty of minimal articulation.

First, the ALJ seemingly collapsed the two-step process of weighing Dr. Sami's opinion

---

[15] Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because her treating physician states that she is "unable to work" or "disabled," because "a treating physician may bring biases to an assessment." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled. *Id.*; 20 C.F.R. § 404.1527(e)(1).

into one; therefore, the Court cannot ascertain, without speculating, whether the ALJ applied an erroneous legal standard. Noyes asserts that the ALJ applied the wrong legal standard when he concluded that Dr. Sami's opinions were "not consistent with the objective medical evidence nor are they corroborated by any other medical opinions of record," arguing that under the "not inconsistent" standard, a medical opinion need not be supported or corroborated by (i.e., consistent with) the other medical evidence of record to be given controlling weight.

When weighing a treating source's opinion, the ALJ must first decide, under the "treating physician's rule," whether to give an opinion controlling weight. This rule provides that if an opinion is "well supported by medically acceptable [evidence] and is *not inconsistent* with the other substantial evidence in [the] record," it should be given controlling weight. 20 C.F.R. § 404.1527(d)(2) (emphasis added). For an opinion to be deemed "not inconsistent," it "need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." SSR 96-2p; *see also Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001) (opining that the ALJ erroneously applied the "not inconsistent" standard because "[u]nder the standard imposed by the ALJ, the opinion only has controlling weight if the record supports it").

If an opinion is not assigned controlling weight, the treating physician's rule "drops out," and the ALJ should consider the factors listed *supra* to decide how much weight to give the opinion. *See Hofslien v. Barnhart*, No. 05-2649, 2006 WL 469484 (7th Cir. March 1, 2006). During this second step, examining whether the opinion is consistent with, and supported by, other evidence is *exactly* what the ALJ should do. *See* 20 C.F.R. §§ 404.1527(d).

18

When the ALJ "rejected" Dr. Sami's opinion, he did not articulate whether he used the "not inconsistent" standard delineated in the treating physicians rule or whether he analyzed Dr. Sami's opinion using the "consistency" factor listed in 20 C.F.R. § 404.1527(d). Because the Court cannot trace the ALJ's line of reasoning, we are unable to determine if he applied an erroneous legal standard. *See Hemphill v. Barnhart*, No. 01 C 6556, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002) ("[N]o court should be forced to engage in speculation as to the reasons for an ALJ's decision.").[16]

Furthermore, the ALJ failed to weigh Dr. Sami's opinion using the factors listed in 20 C.F.R. § 404.1527(d), never discussing (1) that Dr. Sami was one of Noyes's treating physicians; (2) that Dr. Sami was a specialist in psychology; (3) the length of Noyes's treatment relationship with Dr. Sami and the frequency of examination; or (4) the nature and extent of the treatment relationship. *See* 20 C.F.R. § 404.1527(d); *see generally Books*, 91 F.3d at 979 (articulating that when conflicting medical evidence exists, the ALJ must consider the factors articulated in 20 C.F.R. § 404.1527); *Rohan*, 98 F.3d at 971 (finding that an ALJ must sufficiently articulate his assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced). Rather than evaluate these factors, the ALJ simply rejected the opinion of Dr. Sami.

In addition, ALJ failed to articulate the amount of weight given to the various medical

---

[16] Even if it was clear that the ALJ analyzed Dr. Sami's opinion under the treating physician's rule, the Court would still have to speculate whether he erroneously applied the "not inconsistent" standard. If the ALJ found that Dr. Sami's opinion conflicted with other substantial evidence–for example, the State Agency physicians' opinions–he was entitled to deny Dr. Sami's opinion controlling weight. *See Hofslien*, 2006 WL 469484 ("[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight."). If the ALJ concluded, however, that no other evidence directly supported Dr. Sami's findings, then he applied the wrong legal standard. *See Dominguese*, 172 F. Supp. 2d at 1100.

opinions of record. *See* 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record,
including any medical opinion(s), is inconsistent with other evidence or is internally
inconsistent, we will weigh all of the evidence . . . ."). Instead, the ALJ "rejected" the opinion of
Dr. Sami, leaving the Court to speculate whose medical opinion he assigned the greatest weight.
Seemingly, the ALJ gave the greatest weight to the State Agency physicians, since he opined
that his RFC determination is "consistent with (although somewhat more restrictive than) the
State Agency medical opinion of record regarding the claimant's medical impairments and with
Dr. Martin's statement that the claimant seemed capable of gainful employment." (Tr. 17.) The
Court, however, will not engage in such speculation, given that the ALJ did not specifically
mention any other medical evidence when he "evaluated" Dr. Sami's opinion and did not state
that he was rejecting Dr. Sami's opinion in favor of another opinion. *See Hemphill*, 2002 WL
1613721, at *8.

Finally, it is not apparent from the face of the opinion whether the ALJ even considered
Dr. Fray's November 24, 2003, evaluation or Raches's HAPI report when rejecting Dr. Sami's
opinion. *See* 20 C.F.R. § 404.1527 ("[W]e will evaluate every medical opinion we receive.");
Although the ALJ specifically mentioned Dr. Sami as Noyes's treating psychologist at the Park
Center, the ALJ did not name any other doctors or counselors who provided medical records
from Park Center. In fact, the ALJ's discussion of the other Park Center medical reports was
limited to a summary of Noyes's complaints, noting that "[i]t was felt that her insight into her
problems was poor and that she was sometimes impulsive and indecisive." (Tr. 15.) Thus, the
Court cannot decipher, without speculation, whether the ALJ considered the opinions of Dr. Fray

and Raches.[17]

### D. The ALJ's Determination that Noyes is not Credible is not Supported by Substantial Evidence

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimal level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir, 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carrandine v. Barnhart*, 360 F.3d 751,754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Although the ALJ never specifically articulates why he discredited Noyes, both parties seemingly agree that she was discredited because she is able to "live alone, do household chores, care for her children on weekends, read romance books," get along well with her sister and mother, and go out and play pool with her friends. (Tr. 17.) Since she is able to do these

---

[17] Noyes contends that the opinions of Dr. Fray and Raches support Dr. Sami's opinion; therefore, she argues, the ALJ's conclusion that Dr. Sami's opinion was not "corroborated by any other medical opinion of record" is not supported by substantial evidence. (Tr. 17.) Noyes argues, for example, that Dr. Fray's GAF of 50 corroborates Dr. Sami's limitations and that Raches's HAPI form demonstrates that Noyes has significant problems with functioning. The Commissioner counters that the HAPI form reveals that Noyes had only minimal difficulty with occupational functioning, merely documents Noyes's complaints, and does not report any examination findings. The Commissioner also argues that Dr. Fray's GAF score was an isolated incident, citing to higher GAF scores in the medical record. The ALJ, on remand, is the proper person to decide what effect that Dr. Fray and Raches's opinions will have on the weight given to Dr. Sami's opinion, as the Court may not re-weigh the evidence. *Clifford*, 227 F.3d at 869.

activities, the ALJ explained, "there is no reason to find that she is not able completely unable [sic] to function independently outside of the home." (Tr. 17.)

However, the ALJ failed "to consider the difference between engaging in sporadic physical activities and [Noyes's] being able to work eight hours a day five consecutive days a week." *Carrandine*, 360 F.3d at 755; *see also Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (emphasizing that an ALJ must not casually equate household work with employment in the labor market as the choice of caring for children or abandoning them to another's care may impel a claimant to heroic efforts). Indeed, the Seventh Circuit has recently cautioned the Commissioner "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home," since "[t]he pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." *Mendez v. Barnhart*, No. 05-2017, 2006 WL 463258, at *3 (7th Cir. Feb. 28, 2006).[18]

_____

[18] While the Court notes that the record is replete with other grounds for which the ALJ could have discredited Noyes, the ALJ instead chose to discredit Noyes based on flawed reasoning, and the Court is confined to the reasons articulated by the ALJ. *See Carrandine*, 360 F.3d at 756 (internal citations omitted) ("[A]n administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws, even if those flaws might be dissipated by a fuller and more exact engagement with the facts."); *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984); *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005); *Wates v. Barnhart*, 288 F. Supp. 2d 947, 950 (E.D. Wis. 2003) (emphasizing that when reviewing an ALJ's decision, the court is confined to the reasons the ALJ provided and cannot supply its own reasons or rely on the Commissioner's *post hoc* rationalizations).

As the Court cannot properly decide issues of credibility, it will be up to the ALJ to explore any discrepancies on remand. For example, while Noyes claims that her anxiety keeps her from working and making doctor's appointments, she also admitted to Dr. Martin that she quits jobs because she "gets bored" and is not a "morning person" and testified at the hearing that she usually misses "early" appointments. Additionally, she told Dr. Martin that she does not use alcohol or marijuana and testified at the hearing that she has been "clean" for two years, but other medical records directly conflict with this contention.

Furthermore, Noyes's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7p. Although she claims to be disabled as of 1988, she ostensibly did not seek treatment until just after she filed her disability application, and she also missed all of her scheduled appointments with Dr. Sami after he provided his opinion to the Commissioner. Furthermore, Noyes was discharged from Neuropsychiatric Associates for her failure to keep appointments and had not seen a counselor at Park Center for approximately six months prior to the hearing.

### E. The ALJ's Failure to Evaluate Brown's Testimony in his Capacity as Noyes's Former Supervisor was Error

Although the ALJ briefly summarized Sheeley and Brown's testimony in his opinion, he did not evaluate their testimony for the purpose of making a credibility determination.[19] Although an ALJ "need not evaluate in writing every piece of testimony and evidence submitted," when an ALJ ignores an entire line of evidence, his decision falls "below the minimal level of articulation required." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). If, however, testimony is "redundant," an ALJ does not need to independently evaluate it, since the testimony is not a separate line of evidence. *Id.*; *see also Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Brandenburg v. Social Sec. Admin.*, No. 104CV01376DFHWTL, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2, 2005).

In the cases cited above, the claimants brought essentially the same challenge that Noyes asserts here. In *Carlson*, for example, the claimant objected to the ALJ's failure to specifically discuss his wife's testimony, but the Seventh Circuit found that the testimony "essentially corroborated Carlson's account of his [symptoms] and his daily activities" and therefore was "essentially redundant." *Carlson*, 999 F.2d at 181; *see also Books*, 91 F.3d at 980 (finding that claimant's brother's testimony was not a separate line of evidence but instead "served strictly to reiterate, and thereby corroborate, Books's own testimony concerning his activities and limitations").

Here, the testimony of Sheeley and Brown (in his capacity as Noyes's ex-boyfriend)

---

[19] Noyes argues that the ALJ erred because he failed to give reasons for rejecting Sheeley and Brown's testimony; however, the ALJ did not specifically reject their testimony.

regarding the effects of Noyes's mental conditions on her daily activities is redundant and merely serves to corroborate Noyes's testimony; therefore the ALJ did not need to specifically address this testimony. Thus, to the extent the ALJ found Noyes's testimony regarding her conditions "to be untenable when contrasted with [her] reported daily activities and the relevant medical evidence, he necessarily found [Sheeley and Brown's] supporting testimony similarly not credible." *Books*, 91 F.3d at 980.

However, Brown's testimony regarding Noyes's ability to perform her job as a retail worker is ostensibly a separate line of evidence, and the ALJ's failure to consider this testimony is legal error. *See* SSR 85-16 (explaining that when an ALJ assesses the effects of a mental impairment, "[i]nformation concerning an individual's performance in any work setting . . . may be pertinent in assessing the individual's ability to function in a competitive work environment").[20]

Noyes, somewhat incoherently, argues that regulations have been enacted after the *Carlson* line of cases that effectively hold an ALJ to a "higher level[] of articulation," apparently asserting that even if the testimony of Sheeley and Brown is redundant, the ALJ is still under a duty to evaluate it and render a credibility determination.[21] However, none of Noyes's cited regulations and rulings necessitate an independent evaluation and credibility determination for the testimony of friends and family; instead, these regulations essentially explain that an ALJ may consider this testimony when weighing the opinions of medical sources and making

---

[20] Interestingly, although Brown testified that Noyes had a host of problems while on the job, he opined that she could have successfully continued to work there if only "she would've showed up on a regular basis." (Tr. 310.)

[21] As a threshold matter, the *Carlson* line of cases have not been overruled and are still cited by district courts as "good law." *See, e.g.*, *Brandenburg*, 2005 WL 2148119, at *6.

credibility determinations about the claimant. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (medical opinions and symptoms); SSR 96-2p (medical source opinions); SSR 96-7p (claimant credibility).[22]

Noyes also cites to SSR 96-8p, which provides that when making an RFC assessment, an ALJ's decision must "[c]ontain a thorough discussion and analysis of the objective medical and *other evidence*, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate . . . ." SSR 96-8p (emphasis added). It is difficult to ascertain how this ruling places any additional burden of articulation on the ALJ, given that the *Carlson* line of cases hold that "redundant" testimony is not a separate line of evidence.

**F. It is Unclear from the Record whether the ALJ's Hypothetical to the VE was Flawed**

Generally, the hypothetical questions an ALJ poses to a VE must incorporate all of the claimant's relevant limitations, because it is "important for the [VE] to understand the full extent of the applicant's disability so that the expert does not declare the applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform." *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). If, however, the VE reviewed the medical evidence and was present during the administrative hearing before he testified, then the ALJ need not account for every limitation, since the ALJ is allowed to impute knowledge to the VE and assume that the VE "included all of

---

[22] In fact, the *Brandenburg* Court rejected a similar argument, explaining that because Social Security Rule 96-7p governs the determination of the credibility of the claimant's statements, the ALJ will consider the testimony of other individuals "only to the extent that the person's statements are consistent with the objective medical evidence." *Brandenburg*, 2005 WL 2148119, at *6 (citing 20 C.F.R. § 404.1529(a)).

these limitations in his assessment . . . ." *Young*, 362 F.3d at 1003, *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 818-21 (7th Cir. 1995).

Knowledge cannot be imputed to the VE when "[b]y the nature of the questioning . . . the [VE] was prohibited from considering . . . psychological . . . limitations that he may have absorbed either through reviewing the evidence in the record or by listening to the hearing testimony," or when the VE was otherwise "instructed to stick to the particular facts of the hypothetical." *Young*, 362 F.3d at 1003-04. Thus, under these circumstances, hypotheticals that do not include all of the claimant's relevant limitations are flawed. *Id.*

Here, the VE testified that he reviewed Noyes's file and listened to the other testimony. (Tr. 316.) However, because portions of the ALJ's instructions apparently were inaudible, it is unclear from the transcript whether the VE was allowed to consider this information when answering the hypothetical. The transcript delineates the following instructions given to the VE: "I'm going to give you–ask you a hypothetical question. Please disregard any information [INAUDIBLE] the file or listening to testimony [INAUDIBLE] give you specifically in the hypothetical." (Tr. 318.) If the ALJ had said something like, "Please disregard any information *except the information you received from reading* the file or listening to the testimony *or that information which I* give you specifically in the hypothetical," then knowledge could have been imputed to VE, and the ALJ did not need to account for all of Noyes's specific impairments.

If, however, the instructions were, "Please disregard any information *you received from reading* the file or listening to the testimony *and consider only the information* I give you specifically in the hypothetical," the ALJ's hypothetical is flawed because it did not account for all of Noyes's impairments. The ALJ found that Noyes was "moderately limited in her ability to

26

perform activities of daily living, maintain social functioning, and sustain concentration, persistence, or pace." (Tr. 17.) Yet, the hypothetical posed to the VE failed to account for these limitations. Instead, the ALJ asked the VE to "[a]ssume a hypothetical individual in the age range of 26 to 29, educated at the eleventh-grade level, past relevant work the same as the claimant's, *limited to medium work involving only simple repetitive tasks*." (Tr. 318.) (emphasis added)

Specifically, the hypothetical does not take into account Noyes's limitations in maintaining social functioning and sustaining concentration, persistence, or pace. *See Young*, 362 F.3d at 1004 (finding ALJ's hypothetical assuming the claimant could perform only "simple, routine, repetitive, low stress work with limited contact with coworkers and limited contact with the public" flawed because it failed to take into account such limitations as claimant's "significant impairments in social judgment"); *Kasarsky*, 335 F.3d at 543-44 (explaining that a hypothetical asking whether "a person with the capacity to perform sedentary work, who was also limited by borderline intelligence, could find work" did not take into account ALJ's findings that claimant had frequent deficiencies in concentration, persistence, or pace).

## VI. CONCLUSION

In sum, the ALJ did not meet his duty of minimal articulation when he "rejected" the opinion of Dr. Sami, failed to properly weigh the medical opinions of record, and ostensibly did not consider the opinions of Dr. Fray and Raches. Furthermore, he improperly discredited Noyes's testimony and neglected to consider the testimony of Brown, her former supervisor. Finally, the ALJ potentially erred when posing hypothetical questions to the VE. Therefore, the decision of the Commissioner is REVERSED and the case is REMANDED to the Commissioner

27

for further proceedings in accordance with this opinion. The Clerk is directed to enter a judgment in favor of Noyes and against the Commissioner. SO ORDERED.

Enter for this 20th day of March, 2006.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge